**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Civil Action No.: _____

Jonathan Affleck
75 Bailey St. Ste 1L
Dorchester, MA 02124-3724
Jonathan.Affleck@protonmail.com
(617) 276-5788

Jonathan Affleck

    Plaintiff

        v.

The Harvard Crimson Inc (Harvard Crimson)

    Defendant

## COMPLAINT FOR DECLARATORY JUDGMENT, DAMAGES, AND INJUNCTIVE RELIEF
## DEMAND FOR JURY TRIAL

Date: March 27, 2024

Time: 09:38:46 AM

1. Plaintiff Jonathan Affleck states the following claims against The Harvard Crimson Inc (Harvard Crimson).

    **Introduction**

2. As the digital revolution progresses the Internet has become a vehicle to strip Americans of their Constitutional rights and of their protection against discrimination.

    **Jurisdiction**

3. This Court has federal question jurisdiction over this case pursuant to 28 U.S. Code §§ 1331 because Plaintiff's claims arise pursuant to US laws and to the First and Ninth Amendments to the U.S. Constitution. Further, the Court has jurisdiction pursuant to 28 U.S. Code § 1343 because Plaintiff seeks relief under 42 U.S. Code § 1983.

4. This action is an actual controversy, and under 28 U.S. Code §§ 2201 and 2202, this Court has authority to grant declaratory relief, and other relief, including temporary, preliminary, and permanent injunctive relief, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and may declare the rights of Plaintiff.

5. This Court has supplemental jurisdiction over state law claims presented in this matter pursuant to 28 U.S. Code § 1367, because the claims are so related to the federal claims in this action that

1

they do not raise novel or complex issues of state law and do not substantially predominate over the federal claims. There are, further, no exceptional circumstances, which compel state law claims to be declined.

6. Venue is proper in the District of Massachusetts under 28 U.S. Code § 1391(b)(2) because all the acts or omissions, which give rise to the claims, occurred in this judicial district.

7. This Court is authorized pursuant to 42 U.S. Code § 1983, 28 U.S. Code § 2674, and Federal Rules of Civil Procedure 65 and 69 to issue the requested relief.

8. If it is necessary, this Court is authorized to issue reasonable attorneys' fees pursuant to 42 U.S. Code § 1988.

**Parties**

9. Plaintiff Jonathan Affleck is a citizen of the Commonwealth of Massachusetts (USA) and Dorchester resident. His address is 75 Bailey St. Ste 1L, Dorchester Center, MA 02124-3724. His phone number is 617-276-5788.

10. Defendant The Harvard Crimson Inc (Harvard Crimson) prints a daily newspaper (The Harvard *Crimson*[1]) and contracts work for other newspapers. It was established in 1873 and incorporated in 1967 in Massachusetts. The Harvard Crimson provides common carriage for barter and in exchange for work in the comments section of an article. The Harvard Crimson's address is 14 Plympton St., Cambridge, MA 02138-6606. Its phone number is 617-495-7890. The Harvard Crimson Inc is a Delaware corporation.

**Legal Technological Intersection**

11. 47 U.S. Code § 230 states that "the term 'Internet' means the international computer network of both Federal and non-Federal interoperable packet switched data networks." Non-Federal interoperable packet switched data networks include state and private interoperable packet switched data networks. Government packet switched data networks consist of Federal and state packet switched data networks. End user computing devices, which are within and attached to the Internet, can be government or private computing devices. Packet data traffic flows between web or cloud servers and end user computing devices. Government and private web or cloud servers download programs to an end user computing device for the purpose of transporting messages within the packet data traffic to and from web or cloud servers to end user computing devices. Government and private message traffic is mixed and entwined within mixed, interconnected, and entwined government and private technology.

12. 47 U.S. Code § 230(a) declares that in 1996 the Internet had become "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity" to the "benefit of all Americans." This declaration states that the 1996 Internet is a government-designated public forum. By 1996 the government had spent

---

[1] If Crimson is italicized (*Crimson*), the Harvard *Crimson* journal is meant. When Crimson is not italicized, the Harvard Crimson Inc is meant.

2

a tremendous amount of public money in the development of the Internet. 47 U.S. Code § 230(b) declares (a) that continuation of this development of the Internet is a policy of the US government and (b) that it is another policy of the US government to "maximize user control over what information is received by individuals, families, and schools who use the Internet." The US government continues to spend tremendous amount of public money on government networks within the Internet, on government technology within the Internet, and on government end user computing devices within the Internet. Even though the US government has subcontracted a small amount of the management of the Internet to private entities, which the US government often funds and in which the US government often participates, a substantial part maybe most of the US Internet belongs to the US government or is funded by the US government. The US Internet remains a government-designated public forum until the US government repeals 47 U.S. Code § 230.

13. A 1996 Interactive Computer Service (ICS) like AOL, Prodigy, or CompuServe created its own public forum inside and outside the government-designated public forum of the Internet by means of common carriage of messages[2] from a user of the ICS to another user of the ICS. Such a 1996 ICS also "[included] specifically a service or system that [provided] access to the Internet." A 1996 ICS also provided service that was not common carriage.[3] While a 2024 social medium platform creates its own public forum within the government-designated public forum of the Internet by means of common carriage of messages from a user of the social medium platform to another user of the social medium platform, a 2024 social medium platform does not provide access to the Internet. Because a 2024 social medium platform does not "include specifically a service or system that provides access to the Internet," a 2024 social medium platform does not meet the definition of an ICS. A 2024 social medium platform provides an email service that has a niftier user interface than an ordinary Internet email service.[4] Like an

---

[2] 47 U.S. Code § 153 (11) Common carrier not 47 U.S. Code § 153 (51) Telecommunications carrier. The FCC does not define a service to be a common carriage service. The common law definition of common carriage determines whether a service is common carriage. The FCC decides whether a communications-related common carriage service is a telecommunications service that the FCC should regulate. When the FCC makes a determination of its regulatory authority, it applies the following definitions: § 153 (11) Common carrier, § 153 (24) Information service, § 153 (50) Telecommunications, § 153 (51) Telecommunications carrier, § 153 (52) Telecommunications equipment, and § 153 (53) Telecommunications service. When the definitions are applied together, they state that: (a) § 153 (11) Common carrier defines a communications common carrier, (b) § 153 (51) Telecommunications carrier defines a telecommunications carrier, and (c) if a telecommunications carrier is a common carrier, it is a communications common carrier, (d) but not every communications common carrier is a telecommunications carrier.

[3] 47 U.S. Code § 230 seems only to extend the traditional rights and immunities of a communications common carriage service to non-common carriage services of a 1996 ICS so that the 1996 ICS could without incurring possible future liability deny transport of content, which was unfit in a way that was neutral with respect to point of view. Because a 2024 social medium platform provides no non-common carriage services, this extension of rights and immunities is irrelevant to a 2024 social medium platform.

[4] Like FCC-regulated telex service, an ordinary Internet email service like Gmail and a 2024 social medium platform both meet the traditional definition of a telegraph service: a service that transmits a message electrically by wire or by wireless means. The transmission error problem, which worried the Supreme Court in the 19th century, does not exist in the context of the Internet. Since 1869 (approximately six years before the invention of the voice telephone), Massachusetts has penalized denial of common carriage of a message by means of MGL c. 159 s. 1 & s. 2. See also MGL c. 159 s. 10. The frontend of an Internet email service or of a 2024 social medium platform is a specialized interface to a backend database. Non-interactive backend programs fetch a message from the database when the

ordinary Internet email service, a 2024 social medium platform has bailment of a user's message in a backend database (or a user's message can be considered bailment of the social medium platform).[5] Such bailment is not speech of either the Internet mail service or the 2024 social medium platform, but the bailment is valuable to the 2024 social medium platform because the user's message can be used to attract the eyes of another user of the 2024 social medium platform to a web page of the 2024 social medium platform. "Eyes-on-a-page" is a valuable item to the 2024 social medium platform. A 2024 social medium transports messages throughout the Internet, but little of the Internet belongs to a 2024 social medium platform. Most of the US Internet belongs to the government and to other private entities or individuals.

14. A state becomes inextricably entwined with a 2024 social medium platform when it uses the public forum of the social medium platform to create a state public forum, to make state announcements like job postings, or to discuss state legal procedures or rules. The 2024 social medium platform transmits its messages in state networks and runs its software on state end user computing devices. The 2024 social medium platform provides a substitute for a state web or cloud site. Bailment of the state's messages in a backend server is used to attract "eyes-on-a-page" to a web page of the 2024 social medium platform. Such involvement of the state and the 2024 social medium platform in each other's business and activities is much more than the grant of a liquor license and represents inextricable entwinement to the point of symbiosis.[6]

15. The state public forum exists within the public forum of the 2024 social medium platform. The 2024 social medium platform's public forum exists within the government-designated public forum of the Internet. Not only is the Internet a government-designated public forum, but the Internet also belongs to the class of "Establishments affecting interstate commerce or supported in their activities by State action as places of public accommodation." The preceding clause does not require the Internet to be a place of public accommodation but only requires the Internet to be like or as a place of public accommodation. The same logic desegregated a public drinking fountain, which is an establishment supported by state action as a place of public accommodation for drinking water. A public drinking fountain is a device (a valve on a water pipe) and not a place that one can enter. A 2024 social medium platform is located within the Internet because it is located by connection and by IP address within the premises of the Internet. The definition of the word "premises" includes grounds and appurtenances, which include wiring. In short, the phrase "places of public accommodations" includes a public facility

---

message is to be transported.

[5] Every social medium platform provides a service of common carriage of messages. For that service, the backend server is like a letter satchel of a letter carrier. A message in the backend server of a social medium platform is bailment of the social medium platform not speech of the social medium platform just as a letter in the satchel is bailment of the USPS not speech of the USPS. The USPS only has limited legal ability to deny common carriage of a letter. A social medium platform has only limited legal ability to deny common carriage of a user's message.

[6] This paragraph and the first sentence of the following paragraph are included for completeness. While the Commonwealth of Massachusetts maintains a surrogate website via a plurality of social medium platforms, the Commonwealth does not maintain a surrogate website via the social medium platform of the Harvard Crimson Inc.

like a public drinking fountain or like the Internet because each of these two public facilities is like or as a place of public accommodation.[7]

**Facts**

16. Because Defendant Harvard Crimson transports messages by wire or by wireless means, Harvard Crimson provides a traditional telegraph service. Harvard Crimson provides communications common carriage of text messages. Harvard Crimson's fee for communications common carriage of a message from one reader of the Harvard *Crimson* to another reader of the Harvard *Crimson* is a combination of work with barter for carriage. According to the The Harvard Crimson *Advertising Media Kit 2024*, which is available online, Harvard Crimson's website receives 1,400,000 page views per month and 1,300,000 unique readers per month.

17. From Feb 7, 2024 to Feb 10, 2024 Mr. Affleck commented on three articles that appeared in the Harvard *Crimson* and that were related to the Gaza Holocaust. Mr. Affleck used his knowledge of the history of Zionism and of the history of Judaism to demonstrate the vacuousness of various assertions about Palestinians and about the ongoing Gaza Holocaust. The three articles are:

- *Pro-Palestine Groups Rally, Demand Harvard Divest Ties to Israel* by Sally E. Edwards and Joyce E. Kim (February 10, 2024);

- *Ed. Department Investigating Harvard After Anti-Palestinian Discrimination Complaint* by Emma H. Haidar and Cam E. Kettles (February 7, 2024); and

- *Harvard Kennedy School Distances Itself From Event Featuring Controversial Palestinian Professor* by William C. Mao and Dhruv T. Patel (February 5, 2024); and

18. Mr. Affleck used two names when he made these comments:

- Jonathan Affleck and

- Atallah Aflaq (عطا الله عفلق), which is an Arabization of Jonathan Affleck.

19. Under the name Jonathan Affleck, Mr. Affleck posted 18 messages, which were to be transported to readers of the Harvard *Crimson*. Under the name Atallah Aflaq (عطا الله عفلق), Mr. Affleck posted 20 messages, which were to be transported to readers of the Harvard *Crimson*.

20. Sometime during the afternoon or the early evening of Feb 10, 2024, Harvard Crimson suspended Mr. Affleck's ability to request communications common carriage of a message to a reader of the Harvard *Crimson*. All of Mr. Affleck's messages were removed,

---

[7] 42 U.S. Code § 2000a and 42 U.S. Code § 2000b apply both to a public drinking fountain and also to the Internet, but because the Internet is an establishment that contains other establishments, 42 U.S. Code § 2000a (b)(4) applies to a social medium platform within the Internet.

- which were bailment of Harvard Crimson,
- which were speech of Mr. Affleck, and
- which were in the midst of transport to readers of the Harvard *Crimson*.

21. The pattern of denial of communications common carriage of a message indicates that Harvard Crimson routinely discriminates against a user that rejects the religious belief, which asserts that a Jew has a claim to Palestine on the basis of scripture and which further asserts that said Jew has a right to drive Palestinians from their homes, property, villages, and country on the basis of this claim. The communications common carriage service of Harvard Crimson is not full, and nowhere on its website does Harvard Crimson indicate that a message is unfit for transport because it rejects or scorns a religious belief. Rejection and scorn for Islamic religious beliefs is not unusual among the messages that Harvard Crimson transports.

### Claims

#### *First Claim Against Harvard Crimson for Relief: First Amendment – Free Speech (42 U.S. Code § 1983)*

22. Mr. Affleck incorporates by reference and re-alleges herein all paragraphs above.

23. By removing Mr. Affleck's content, which is bailment in a backend Harvard Crimson server (not Harvard Crimson's speech), and by permanently disabling Mr. Affleck's account, Harvard Crimson abridged Mr. Affleck's speech. Mr. Affleck has no adequate remedy at law and will suffer serious and irreparable harm to his Constitutional rights unless Defendants are enjoined from violating his federal Constitutional rights.

24. Pursuant to 42 U.S. Code §§ 1983 and 1988, Mr. Affleck is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief.

#### *Second Claim Against Harvard Crimson for Relief: Massachusetts Constitution Article XVI – Free Speech (42 U.S. Code § 1983)*

25. Mr. Affleck incorporates by reference and re-alleges herein all paragraphs above.

26. By removing Mr. Affleck's content or decreasing visibility of the content, which is bailment in a backend Harvard Crimson server, and by permanently disabling Mr. Affleck's account, Harvard Crimson abridged Mr. Affleck's speech. Mr. Affleck has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless Defendants are enjoined from violating his state Constitutional rights.

27. Pursuant to 42 U.S. Code §§ 1983 and 1988, Mr. Affleck is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief.

***Third Claim Against Harvard Crimson for Relief: Common Carriage Discrimination, Denial of Common Carriage of Messages (42 U.S. Code § 1981, 42 U.S. Code § 1982, 42 U.S. Code § 1983, 47 U.S. Code § 202, 47 U.S. Code § 206, 47 U.S. Code § 207, M.G.L. c. 159 s. 1, and M.G.L. c. 159 s. 2), and Ninth Amendment Right to Non-Discriminatory Common Carriage[8]***

28. Mr. Affleck incorporates by reference and re-alleges herein all paragraphs above.

29. Harvard Crimson violates Federal law of communications common carriage of messages by disabling Mr. Affleck's ability to request communications common carriage of a message. Harvard Crimson must restore Mr. Affleck's ability to request communications common carriage of a message by means of the common carriage service of Harvard Crimson.

30. Mr. Affleck requests transport of approximately 13 messages per day to 20,000 unique readers of the Harvard *Crimson*. Since the earliest days of telegraph service, such a message or despatch[9] has been other property in the sense of M.G.L. c. 159 s. 1. At the lowest penalty ($50) that Massachusetts could levy per denial,[10] Harvard Crimson must pay the Mr. Affleck at least $13 million per day for refusal to accept a message from Mr. Affleck.

31. The maliciousness and contractual bad faith of both Harvard Crimson's denial of common carriage and also Harvard Crimson's refusal to allow Mr. Affleck to convey unpublished literary property to the public justifies assessing a higher penalty per instance of denial of communications common carriage of a message. Harvard Crimson should be penalized at the maximum ($500) for denial of communications common carriage of a message.[11]

***Fourth Claim Against Harvard Crimson for Relief: Public Accommodation Discrimination
(42 U.S. Code § 2000a, 42 U.S. Code § 2000a–3, 42 U.S. Code § 2000a–6, M.G.L. c. 272 s. 92A, and M.G.L. c. 272 s. 98)***

32. Mr. Affleck incorporates by reference and re-alleges herein all paragraphs above.

---

[8] The right to non-discriminatory common carriage was well-established at the time of the ratification of the US Constitution. The Ninth Amendment protects this right.

[9] The Massachusetts General Laws call a telegraph message a despatch.

[10] Such a penalty has been applied throughout the USA to denial of common carriage of messages (other property) electrically by wire or by wireless transmission since the late 1840s. A message is property of the sender, and the message is transported from an origination point to a destination. In contrast, a voice call of the circuit-switched telephone network is bidirectional, and an item or other property, which is transported from an origination point to a destination, cannot be identified during a bidirectional voice call.

[11] The penalty, which is associated with denial of communications common carriage of a message by Harvard Crimson, seems excessive and possibly a violation of the Eighth Amendment, but $500 was a huge penalty in 1869 when M.G.L. c. 159 s. 1, and M.G.L. c. 159 s. 2 were enacted. Because of inflation since 1869, the penalty began to seem minor. Yet, the penalty should be immense because of the damage a social medium platform does to public discussion when the social medium platform abridges freedom of expression. Thanks to the context of the Internet, the penalty for denial of communications common carriage of a message by the social medium platform has returned to the huge amount that it was intended to be.

33. Mr. Affleck has suffered public accommodation discrimination by Harvard Crimson on the ground of religion at least 260,000 times per day on which Harvard Crimson refuses to accept a message from Mr. Affleck.

34. Pursuant to 42 U.S. Code § 2000a–3, Mr. Affleck is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief. Pursuant to M.G.L. c. 272 s. 98, Mr. Affleck is entitled to payment of a liability of $78 million per day on which Harvard Crimson refuses to accept a post from Mr. Affleck.

## Relief for Defendant's Violations

WHEREFORE, Mr. Affleck prays

- that a judgment be entered in his favor and against the Defendant;
- that compensations for damages, torts, and inconveniences be awarded to the Mr. Affleck in an amount to be determined, plus interest and costs; and
- that the Defendant be compelled to undertake preemptive and curative actions not limited to those described above to correct and remedy the violations that the Defendant has been committing.

## Jury Demand

In accordance with Federal Rule of Civil Procedure 38 (b), Mr. Affleck hereby demands trial by jury with respect to all claims or issues so triable.

Dated: March 28, 2024

Respectfully submitted by: *Jonathan Affleck*

Jonathan Affleck
75 Bailey St. Ste 1L
Dorchester Center, MA 02124-3724
Jonathan.Affleck@protonmail.com
(617) 276-5788