## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Civil Action No.: 1:24-cv-10802-AK

Jonathan Affleck
2816 MLK JR Way
Berkeley, CA 94703
Jonathan.Affleck@protonmail.com
(617) 276-5788

Jonathan Affleck

    Plaintiff

        v.              ORAL ARGUMENT REQUESTED

The Harvard Crimson
Inc (Harvard Crimson)

    Defendant

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT THE HARVARD CRIMSON, INC.'S MOTION  AND IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT IN HIS FAVOR ON THE PLEADINGS

## Table of Contents

Tables of Authorities.................................................................................................2
    Cases....................................................................................................................2
    Patents.................................................................................................................2
    Constitutional Provisions....................................................................................2
    Statutes................................................................................................................3
    Miscellaneous......................................................................................................3
Preliminary Statement...........................................................................................3
Counterargument....................................................................................................5
    Legal Standard....................................................................................................5
    47 U.S. Code § 230 Does Not Shield the Crimson.............................................8
    Common Carriage Law is Not Quaint But Is Important Living Law.................8
    All Essential Elements of Affleck's Claim Are Supported.................................10
        Under Color of (an Incorrect Interpretation of) Law (§ 230)..........................11
        Common Carriage and Judicial Discretion.......................................................11
        The Internet versus Manhattan Community Access Corp. v. Halleck, 139 S. Ct. 1921 (2019).....11
        Misreading 42 U.S. Code § 2000a.....................................................................12
Conclusion..............................................................................................................13
Exhibit A................................................................................................................14
    A treatise on electric law, comprising the law governing all electric corporations, uses and
    appliances, also all relative public and private rights.......................................14
Exhibit B................................................................................................................21

Crawford, Susan P., Transporting Communications (August 25, 2008). Boston University Law Review, Vol. 89, pp. 878-879, 2009....................................................................................21

<u>Tables of Authorities</u>

*Cases*

1. *Am. Tel. & Tel. Co. v. IMR Cap. Corp.*, 888 F. Sup. 221 (D. Mass. 1995) — 11
2. *Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994) — 4
3. *Debevoise v. N Y Dept of Fin*, 80 N.Y.2d 657, 593 N.Y.S.2d 974, 609 N.E.2d 514 (N.Y. 1993) — 4
4. *Easylink Servs. Int'l, Inc. v. State Tax Appeals Tribunal*, 101 A.D.3d 1180, 955 N.Y.S.2d 271, 2012 N.Y. Slip Op. 8366 (N.Y. App. Div. 2012) — 4
5. *Jackson v. Rogers*, 2 Show. K.B. 327, 89 Eng. Rep. 968 (K.B. 1683) — 9
6. *Lovett v. Hobbs*, 2 Show. K.B. 127, 89 Eng. Rep. 836 (K.B. 1680) — 9
7. *Mac Andrew v. The Electric Co.*, 17 C. B. (Eng.) 3 (1855) — 5
8. *Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) — 11
9. *Martillo v. Twitter Inc.*, 2021 WL 8999587 (D. Mass. Oct. 15, 2021), aff'd, 2022 WL 18862030 (1st Cir. Oct. 4, 2022), cert. denied, 143 S. Ct. 779 (2023) — 11
10. *Netchoice v. Paxton*, Brief of Professor Philip Hamburger as *Amicus Curiae* in Support of Respondent, On Writ of *Certiorari* to the United States Court of Appeals  for the Fifth Circuit, January 22, 2024, https://www.supremecourt.gov/DocketPDF/22/22-555/298290/20240122141758929_Netchoice%20Amicus.pdf — 3
11. *Noah v. AOL Time Warner Inc.*, 261 F. Supp. 2d 532 (E.D. Va. 2003) — 4
12. *Parks v. Alta Cal. Tel. Co.*, 13 Cal. 422 (1859) — 5
13. *Pennsylvania Railroad Co. v. Puritan Coal Mining Co.*, 237 U.S. 121 (1915) — 7
14. *Richards v. United States*, 369 US 1, 9 (1962) — 12
15. *Salinger v. Random House*, Inc., 811 F.2d 90 (2d Cir. 1987) — 11
16. *U.S. v. Stevens*, 559 U.S. 460, 130 S. Ct. 1577, 176 L. Ed. 2D 435 (2010) — 9
17. *Stratton Oakmont, Inc. v. Prodigy Servs.*, 23 Media L. Rep. (BNA) 1794, 1995 WL 323710, 1995 N.Y. Misc. LEXIS 229 (N.Y. Sup. Ct. 1995) — 8
18. *Western Union Tel. Co. v. Call Pub. Co.*, 181 U.S. 92, 101-2 (1901) — 7

**Patents**

1. Alexander Graham Bell, *Improvement in Telegraphy*, US174465A, March 7, 1876 — 11
2. Samuel E. B. Morse, *Improvement in the Mode of Communicating Information by Signals by Electro-Magnetism*, US1647A, June 6, 1840 — 11

**Constitutional Provisions**

1. U.S. Constitution Article I, Section 1 — 4, 13

2.  U.S. Constitution Amendment I                                       9

**Statutes**

1.  17 U.S. Code § 102                                                  11
2.  42 U.S. Code § 1981                                                 11
3.  42 U.S. Code § 1982                                                 11
4.  42 U.S. Code § 1983                                                 11
5.  42 U.S. Code § 2000a                                        4, 12, 13
6.  42 U.S. Code § 2000b–2                                             12
7.  47 U.S. Code § 202                                                  4
8.  47 U.S. Code § 230                                      3, 4, 8, 9, 11, 13
9.  M.G.L. Chapter 159 § 1                                             11
10. M.G.L. Chapter 159 § 2                                             11

**Miscellaneous**

1.  Blackstone, William, *Commentaries on the Laws of England*, Vol. 3, Oxford       7
    at the Clarendon Press, 1768, https://archive.org/details/bim_eighteenth-
    century_commentaries-on-the-laws_blackstone-william_1768_3.
2.  Crawford, Susan P., Transporting Communications (August 25, 2008).              5, 21
    Boston University Law Review, Vol. 89, p. 871, 2009, Available at SSRN:
    https://ssrn.com/abstract=1254983.
3.  T. W. D., "The Law of Telegraphs and Telegrams", *The American Law*              5
    *Register (1852-1891)*, Vol. 13, No. 4, New Series Volume 4 (Feb., 1865), pp.
    193-212, republished by *The University of Pennsylvania Law Review*, URI:
    http://www.jstor.org/stable/3302631.
4.  Joyce, Joseph A. (Joseph Asbury); Joyce, Howard C. (Howard Clifford), *A*        4, 14
    *treatise on electric law, comprising the law governing all electric*
    *corporations, uses and appliances, also all relative public and private*
    *rights*, New York, The Banks law publishing co., 1907, pp. 2-8, URI:
    https://archive.org/details/cu31924019380652/page/2/mode/2up.
5.  Rex, Benjamin F.,  "Liability of Telegraph Companies for Fraud, Accident,        5
    Delay and Mistakes in the Transmission and Delivery of Messages", *The*
    *American Law Register*, May, 1884, Vol. 32, No. 5, New Series Volume 23
    (May, 1884), pp. 281-294, URI: https://www.jstor.org/stable/3304891.

## Preliminary Statement

In his *Netchoice v. Paxton*, *Amicus* Brief, Columbia University Law School Professor and Constitutional Scholar Philip Hamburger points out that "Common-carrier doctrine is the foundation of our antidiscrimination law.[1]"

---

[1]  The entire *amicus* brief is worth reading. Section *E. The Carrier–Speaker Distinction Is Constitutionally Ingrained*, p. 13, explains the depth of the harm that caselaw of misinterpreted 47 U.S. Code § 230 inflicts on the US Constitutional system.

3

By arguing that 47 U.S. Code § 230 immunizes the Crimson against Affleck's complaint, the Crimson contends  that Congress intended to allow the Crimson to profit from offering communications common carriage of messages[2] without fulfilling contractual obligations to the public and without obeying common carriage law.

The Crimson's argument would wipe out virtually all anti-discrimination law as the economy and public discussion move almost entirely online. For example, a restaurant could require that a patron set up a reservation by means of a social medium platform that used its alleged editorial discretion to remove or to reject non-white users.

The § 230-associated caselaw is almost entirely based upon pleadings without determination of fact. In addition, the documents of § 230-related litigation almost invariably fail to apply tenets of  common carriage law and show confusion with regard to the relevant technology.[3]

Because a 2024 social medium platform does not provide access to the Internet, such a platform does not meet criteria for an Interactive Computer Service (see below).

§ 230 does not apply to a 2024 social medium platform including the Crimson's comments section.  In order for § 230 to apply, a Federal Court would have to interpret § 230 beyond its written text. Such a court would effectively have to legislate, an act which would violate U.S. Constitution Article I, Section 1 (separation of powers).

Even though the service, which a 2024 social medium platform provides to a user, is a minor evolution of telegraph service,[4] the "Wow! Factor" has lead to incorrect legal

---

[2]    Since the 1850s, telegraph service has provided point-to-point (or point-to-multipoint) digital message-switched communications transport of a message from an origin to a destination by means of wires or by means of radio. Compl. ¶ 13 & its associated footnotes explain "communications common carrier" from the standpoint of Title 47. A communications common carrier must obey 47 U.S. Code § 202 even if it is providing an interactive computer service according to  47 U.S. Code § 230.

[3]    *Noah v. AOL Time Warner Inc.*, 261 F. Supp. 2d 532 (E.D. Va. 2003) is an example of cartoonish litigation. An AOL Chat Room is an elementary example of virtual reality. Plaintiff Noah complained of discrimination in an abstraction that was created by AOL software. In his complaint under 42 U.S. Code § 2000a, Noah in effect confused the movie with the movie theater.  If a § 230 decision directly or indirectly cites *Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994), the decision probably cannot be taken serious;y. While the Internet is an establishment, the Internet is an establishment in the sense of an established digital communications system or structure. The Internet is not an establishment in the sense of group as establishment is used in the phrase "military establishment." If a § 230 decision references *Clegg*, the decision would seem to imply that a message is transported through the Internet by magic.

[4]    Joyce, Joseph A. (Joseph Asbury); Joyce, Howard C. (Howard Clifford), *A treatise on electric law, comprising the law governing all electric corporations, uses and appliances, also all relative public and private rights*, New York, The Banks Law Publishing Co., 1907, pp. 2-8, URI: https://archive.org/details/cu31924019380652/page/2/mode/2up. See p. 14 (Exhibit A). The State of New York uses such a general definition of telegraph service in the application of NY laws and regulations. See *Easylink Servs. Int'l, Inc. v. State Tax Appeals Tribunal*, 101 A.D.3d 1180, 1182-83 (N.Y. App. Div. 2012) ("In our view, whether Tax Law § 1105(b)(1)(B) is construed narrowly—as petitioner argues it should because it is a statute that levies a tax ( *see e.g. Debevoise & Plimpton v. New York State Dept.*

conclusions about the applicability of § 230 to a 2024 social medium platform. The effect of the Wow! Factor has mislead Courts in the past.

> "In two early cases, *Parks v. Alta Cal. Tel. Co.*, 13 Cal. 422 (1859), and *Mac Andrew v. The Electric Co.*, 17 C. B. (Eng.) 3 (1855), they were held to be common carriers; but in other early cases the courts, when they considered the nature and power of electricity, thought it so strange, wonderful and incomprehensible, that no ordinary human care or skill could possibly suffice to control it perfectly, and, deeming it therefore unjust to hold telegraph companies bound by the strict rules which govern common carriers, sought out reasons for making a distinction between these new carriers of thought and the old carriers of merchandise.[5]"

By 1869, when Massachusetts codefied its common carriage caselaw, which had developed since the British colonial period of the 17th century, the Wow! Factor had dissipated.

## Counterargument

### Legal Standard

In the comments section of an article, the Crimson has held out to the public transport of a message to every individual reader of the article (see below, "*Join the discussion…*").

---

*of Taxation & Fin.,* 80 N.Y.2d 657, 661, 593 N.Y.S.2d 974, 609 N.E.2d 514 [1993] )—or broadly—as respondent Commissioner of Taxation and Finance contends based upon the express language of the statute—the Tribunal's determination to interpret such statute as applicable to petitioner's services should be upheld. Petitioner describes its service as one whereby the customer may send petitioner text or data, in any format, which petitioner can then convert to another format (for example, a text message to a fax). Additionally, petitioner may add logos or letterhead to the message before sending the information to the designated recipient and provides a secure email service on its closed network, as well as tracking and authentication features. During the relevant time, petitioner used simple mail transfer protocol (hereinafter SMTP) to route data over the Internet and its own network. Applying the definition of telegraphy set forth in 20 NYCRR 527.2(d)(2) to petitioner's services, it is reasonable to conclude that this process entails the use of "coded or other signals" to transmit information. Indeed, "Example 3" of 20 NYCRR 527.2(d)(2) specifically includes "[m]essage switching services, transmitted to a computer over lines leased from a communication carrier" as telegraph services subject to tax, and "Example 4" specifically includes "[f]acsimile" or fax services as taxable.")

[5]   See Benjamin F. Rex, "Liability of Telegraph Companies for Fraud, Accident, Delay and Mistakes in the Transmission and Delivery of Messages," *The American Law Register*, May, 1884, Vol. 32, No. 5, New Series Volume 23 (May, 1884), p. 282, URI: https://www.jstor.org/stable/3304891. Early telegraphy caselaw is relevant because a social medium platform meets the classic definition of a telegraph, to wit, a system that transmits a message by wire or by wireless means. See T. W. D., "The Law of and Telegrams", *The American Law Register (1852-1891)*, Vol. 13, No. 4, New Series Volume 4 (Feb., 1865), pp. 193-212, republished by *The University of Pennsylvania Law Review*, URI: http://www.jstor.org/stable/3302631. The history of communications common carriage law is elaborated in Crawford, Susan P., "Transporting Communications" (August 25, 2008). *Boston University Law Review*, Vol. 89, p. 871, 2009, Available at SSRN: https://ssrn.com/abstract=1254983. See p. 21 (Exhibit B).



Denial of common carriage is a self-evidencing violation. The Crimson has admitted in its Motion to Dismiss that it has denied communications common carriage of a message that Affleck presented to the Crimson.

Blackstone explains common carriage in a passage that applies to Massachusetts common carriage statutes and caselaw. Massachusetts common carriage statutes and caselaw antedate Blackstone's writings by over a century.

There is also in law always an implied contract with a common inn-keeper, to secure his guest's goods in his inn; with a common carrier or bargemaster, to be answerable for the goods he carries; with a common farrier, that he shoes a horse well, without laming him; with a common tailor, or other workman, that he performs his business in a workmanlike manner: in which if they fail, an action on the case lies to recover damages for such breach of their general undertaking. But if I employ a person to transact any of these concerns, whose common profession and business it is not, the law implies no such general undertaking; but in order to charge him with damages, a special agreement is required.

Also if an inn-keeper, or other victualer, hangs out a sign and opens his house for travelers, it is an implied engagement to entertain all persons who travel that way; and upon this universal *assumpsit* an action on the case will lie against him for damages, if he without good reason refuses to admit a traveler.[6]

The Supreme Court has explained that the federal government enforces state common carriage law.

What is the common law? According to Kent: "The common law includes those principles, usages and rules of action applicable to the government and security of person and property, which do not rest for their authority upon any express and positive declaration of the will of the legislature." 1 Kent, 471. As Blackstone says: "Whence it is that in our law the goodness of a custom depends upon its having been used time out of mind; or, in the solemnity of our legal phrase, time whereof the memory of man runneth not to the contrary. This it is that gives it its weight and authority; and of this nature are the maxims and customs which compose the common law, or *lex non scripta*, of this kingdom. This unwritten, or common, law, is properly distinguishable into three kinds: 1. General customs; which are the universal rule of the whole kingdom, and form the common law, in its stricter and more usual signification." 1 Blackstone, 67. In Black's Law Dictionary, page 232, it is thus defined: "As distinguished from law created by the enactment of legislatures, the common law comprises the body of those principles and rules of action relating to the government and security of persons and property, which derive their authority solely from usages and customs of immemorial antiquity, or from the judgments and decrees of the courts recognizing, affirming and enforcing such usages and customs; and, in this sense, particularly the ancient unwritten law of England."

Can it be that the great multitude of interstate commercial transactions are freed from the burdens created by the common law, as so defined, and are subject to no rule except that to be found in the statutes of Congress? We are clearly of opinion that this cannot be so, and that the principles of the common law are operative upon all interstate commercial transactions except so far as they are modified by Congressional enactment.

*Western Union Tel. Co. v. Call Pub. Co.*, 181 U.S. 92, 101-2 (1901)

Common carriage obligations are held to be too important to be overridden. The Supreme Court has explained that a provider of common carriage service cannot escape the duties and obligations of common carriage law by imposing terms of service as a 2024 social medium platform often does even if the Crimson does not. In *Pennsylvania Railroad Co. v. Puritan Coal Mining Co.*, 237 U.S. 121 (1915), the Supreme Court held that the railroad, as a common carrier, could not contract out of its duty to provide transportation services. The Court emphasized that any contractual terms attempting to limit the carrier's obligations would be invalid if they contravened the public duties imposed by common carriage law. The legal logic seems to apply to any common carrier including a communications common carrier of messages as the Crimson is with respect to comments in the comments section of an article.

---

[6]   William Blackstone, *Commentaries on the Laws of England*, Vol. 3, Chapter 9, p.164, https://archive.org/details/bim_eighteenth-century_commentaries-on-the-laws_blackstone-william_1768_3/page/164/mode/2up?q=bargemaster.

## 47 U.S. Code § 230 Does Not Shield the Crimson

The Crimson's social medium platform does not conform to the definition of Interactive Computer Service in § 230(f)(2) because this social medium platform does not "[include] specifically a service or system that provides access to the Internet." A social medium platform like the Crimson asserts that without the shield of § 230, a social medium platform could not function because of the threat of legal liability. This assertion is unprovable and requires a Federal Court to ignore the plain meaning of the text of § 230. In reality, since a 2024 social medium platform, unlike a 1996 online service provider, provides its social medium service only by means of common carriage, the shield of § 230 is unnecessary to a 2024 social medium platform because common carriage law provides an adequate shield.

The claim of the necessity of the shield of § 230 is pretextual. Powerful groups seem to want to discriminate against some Americans in public accommodation and in public discussion. These groups are using § 230 unconstitutionally to devolve American political, social, and legal systems to an earlier more discriminatory more exclusionary state even though common carriage law is a more than adequate shield against unwarranted liability for the transport of third party content.

## Common Carriage Law is Not Quaint But Is Important Living Law

Internet exceptionalism is illogical. Common carriage has evolved to cover common carriers as diverse as ferries, barges, stagecoaches, railroads, telegraphs, telephony, the US Postal Service, FedEx, Amazon delivery, bicycle couriers, taxi or limo service (including Lyft, etc.), DoorDash (or similar common carriers), grocery common carriage service, pneumatic mail, trucker common carriers, some escalators, some elevators, a Ferris wheel, a roller coaster (or similar amusement park rides), air common carriers, telex, pager service, email service, SMS, MMS, container ships, pony express, oil pipelines, etc. The list is endless. No reason exists that suggests a social medium platform cannot fit into this eclectic group.

A social medium platform like the Crimson misrepresents the original intent of § 230. In 1996 in the aftermath of *Stratton Oakmont, Inc. v. Prodigy Servs.*, 23 Media L. Rep. (BNA) 1794, 1995 WL 323710, 1995 N.Y. Misc. LEXIS 229 (N.Y. Sup. Ct. 1995), Congress worried that a specific threat of liability for publisher and distributor libel would impede the growth of the Internet. This specific threat only existed when an online service provider offered a service that was not a communications common carriage service. Prodigy's "Money Talk Service" was similar to a radio broadcast, and when Prodigy removed some of the associated content, Prodigy seemed to be acting like a publisher or like a distributor and incurred liability for the content that was transported within the Prodigy network. Congress decided to extend the privileges and the immunities of common carriage service to a non-common-carriage service of a 1996 online service like AOL, Compuserve, or Prodigy in order to protect the 1996 online service from

liability for third party content if the online service occasionally reviewed and removed third party content.

According to the law of common carriage, Prodigy would have had the ability to review content and choose not to carry unfit content without becoming either a publisher or distributor of the content because a common carrier has a limited discretion to reject a request for transport without incurring liability as the following decisions indicate.

- <u>A common carrier is a person who holds himself out as willing to serve any shipper who offers him a reasonable fee to transport the kinds of goods he professes to carry to a place he professes to serve, provided they were not **unfit** and his conveyance was not already full.</u> See *Lovett v. Hobbs*, 2 Show. K.B. 127, 89 Eng. Rep. 836 (K.B. 1680); *Jackson v. Rogers*, 2 Show. K.B. 327, 89 Eng. Rep. 968 (K.B. 1683).

- <u>By definition, a common carrier has to serve all comers. If he wrongfully refuses to accept a consignment, he is suable in tort.</u> See *Jackson v. Rogers*, 2 Show. K.B. 327, 89 Eng. Rep. 968 (K.B. 1683).

Unfitness of content in common carrier messages would not be limited to speech that is not protected by the First Amendment.[7] If a communications common carrier of messages only held out transport of content for children, adult content would be unfit for transport by the common carriage.[8] However such a common carrier would violate common carriage law if it only removed adult content that was created by a nonwhite because such discriminatory removal would constitute bad faith.

Not only does 47 U.S. Code § 230 say nothing about editorial discretion, but the section of this statute below shows the exact original intent of extending the privileges, immunities, and obligations of common carriage service to interactive computer service as interactive computer service is defined in 47 U.S. Code § 230(f)(2) Interactive Computer Service.[9]

**47 U.S. Code § 230 - Protection for private blocking and screening of offensive material**

(c) Protection for "Good Samaritan" blocking and screening of offensive material

(1) Treatment of publisher or speaker

---

[7] See *U.S. v. Stevens*, 559 U.S. 460, 130 S. Ct. 1577, 176 L. Ed. 2D 435 (2010).

[8] A communications common carrier of messages can also provide multiple tiers of service to separate one type of message class (e.g., political) from another type of message class (e.g., sports-related).

[9] 47 U.S. Code § 230 was enacted almost 30 years, and some of its language can be obscure to someone under 40 years old. In 1996 the meaning of Access Software Provider was obvious because sidewalks and streets were covered with litter that contained CDROMs that were produced by many online services and that contained access software that was to be installed on a PC so that the PC's owner could access an online service.

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

(2) CIVIL LIABILITY

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

Neither the Congress nor any state legislature has indicated that common carriage law is obsolete and should be discarded from US legal system.

## A 2024 Social Medium Platform Waived Its First Amendment Rights by *Assumpsit*

The Crimson and every 2024 social medium platform waives First Amendment rights just as a person waives First Amendment rights by signing a Non-Disclosure Agreement. Modern society does not function if the principle *pacta sunt servanda* (contracts must be honored) no longer applies.

The caselaw of § 230 undermines civil rights law and contract law. As such, the current status of this caselaw undermines fundamental tenets of American society. The federal judiciary should act decisively to overturn § 230 caselaw.

## All Essential Elements of Affleck's Claim Are Supported

If Affleck's complaint did not meet the Twiqbal standard, the Crimson would have responded not by asserting conclusorily that the Crimson failed to hold out communications common carriage of a message in the comments section but would have responded by arguing cogently that the Crimson's service fails in some way to hold out to the public transport of a message under standard terms for a fee. In Massachusetts a Court determines as a matter of law after presentation of the facts whether a service is common carriage.

The Crimson did not respond in any meaningful way to Compl.¶¶ 11-16.

### Under Color of (an Incorrect Interpretation of) Law (§ 230)

Because the caselaw of § 230 does not apply and because the social medium platform service of the Crimson is not an Interactive Computer Service according to the definition in § 230, the Crimson discriminates under color of law when the Crimson justifies its violations by means of § 230. The misinterpretation of § 230 by some federal judges does not exculpate the Crimson of violation of 42 U.S. Code § 1983.

### Common Carriage and Judicial Discretion

Because Judge Stearns dismissed *Martillo v. Twitter Inc.*, 2021 WL 8999587 (D. Mass. Oct. 15, 2021) without prejudice on the basis of judicial discretion, this case does not provide compelling caselaw. In his order Judge Stearns mentioned *Am. Tel. & Tel. Co. v. IMR Cap. Corp.*, 888 F. Supp. 221 (D. Mass. 1995), which is an irrelevant voice precedent.[10] Affleck addresses the distinction between a digital message, which is property that is transported from an origin to a destination,  and voice communications in Compl. ¶ 30 footnote 10. US Courts have long considered a telegraph message (despatch), email, and an SMS text to be a form of  property and have punished denial of communications common carriage of this form of property since the 1840s. A social medium platform service differs from an email service only in that the frontend user interface of the social medium platform is niftier (Compl. ¶ 13).

### The Internet versus Manhattan Community Access Corp. v. Halleck, *139 S. Ct. 1921 (2019)*

*Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) has no relevance to a social medium platform service that operates within the Internet. Ownership of a cable network and ownership of the Internet have no similarity (Compl. ¶ 13). Manhattan Community Access Corp. selected its programming and transmitted its programming on its cable channels even if no one was watching the channel.

---

[10]   Massachusetts enforced M.G.L. Chapter 159 §§ 1-2 against a discriminatory communications common carrier of a telegraph despatch (message) for seven years before Alexander Graham Bell was granted a patent to the analog voice telephone.  See (a) Samuel E. B. Morse, *Improvement in the Mode of Communicating Information by Signals by Electro-Magnetism*, US1647A, June 6, 1840, and (b) Alexander Graham Bell, *Improvement in Telegraphy*, US174465A, March 7, 1876. Other states addressed a discriminatory communications common carrier of a message in exactly the same way, and no one doubted that a digitally transported message was a form of property. (The telegraph network has used digital electronic communications since the 1840s.) With respect to M.G.L. Chapter 159 §§ 1-2, it matters not whether the type of property is non-tangible intellectual property, contractually created property, statutorily created property, unpublished person literary property, or some other type of property. It also matters not who owns the property. Eventually, the Federal government caught up with the states and acknowledged that creative intellectual property could be inscribed in a substrate other than paper. See 17 U.S. Code § 102. Not only has the Crimson violated the *assumpsit* contract of common carriage (a violation of 42 U.S. Code § 1981), but the Crimson also violated 42 U.S. Code § 1982 when the Crimson refused to convey Affleck's unpublished personal literary property to the public. See *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987) for a discussion of unpublished personal literary property.

Transport of Affleck's comment by the Crimson's social medium platform service uses a completely different procedure that is communications common carriage. When Affleck wanted to read and possibly comment on a *Crimson* article, he sent (via his computing device) a request (HTTP GET Request) for the Crimson to transport its start page from the Crimson backend to Affleck's computing device. The Crimson start page is a program that transforms Affleck's computing device into a Harvard Crimson frontend.

Affleck selects an article, decides to comment on the article, fills in the comment box, and then sends the comment to the Crimson from the Crimson frontend, which runs on Affleck's computing device. Affleck makes one request per reader of the article. The Crimson warehouses Affleck's message not in a Harvard Crimson backend, in which a *Crimson* article is stored but in a 3rd party comment warehouse, whose name is Disqus. (A common carrier often warehouses items during transport.)

When a *Crimson* reader requests the article from the Crimson, the Crimson's software gets Affleck's message from the message warehouse and transports Affleck's message to a reader's computing device. In this way, the Crimson would have fulfilled one of approximately 20,000 requests for common carriage. Because the Crimson has violated Massachusetts common carriage law, the Crimson owes Affleck $50-500 for each common carriage request that the Crimson has not fulfilled.[11]

The statutes and caselaw of cable transmission have never been applied to a telegraph service (and *vice versa*). A cable precedent like *Manhattan Community Access Corp.* has relevance neither to the Internet nor to a service within the Internet.

### *Misreading 42 U.S. Code § 2000a*

Affleck explained how the Crimson provides a place of public accommodation in Compl. ¶ 15. Both § 2000a and also 42 U.S. Code § 2000b–2 apply. The use of "as" (a simile) in § 2000a is significant and dispositive. The Supreme Court has taught that words matter in statute.

> "The ease of application inherent in the rule urged by American lends a certain attractiveness, but we are bound to operate within the framework of the words chosen by Congress and not to question the wisdom of the latter in the process of construction." *Richards v. United States*, 369 U.S. 1, 10 (1962).

---

[11]   At least as far back as the 1850s when a telegraph network became message-switched, a customer of a telegraph system made multiple requests for communications common carriage of a message when he addressed multiple destinations. When Affleck "joined the discussion" (see image above), he made a separate request for common carriage of a message to each reader of the article, on which he commented as a telegraph customer makes multiple separate requests when the telegraph user requests transport of his message to multiple users. A packet-switched network is a minor evolution of the message-switched network of telegraph service and not a completely different system and technology as cable-casting is.

Because the Internet is tremendously state supported (far more than the telegraph system ever was), § 2000a applies, and the Internet need only be like or as a place for § 2000a(b)(4) to apply to the Crimson.

## Conclusion

The caselaw of § 230 violates U.S. Constitution Article I, Section 1, and strips the American public of rights.[12] Because a 2024 social medium platform benefits from the inaccurate interpretation of § 230, the 2024 social medium platform is attempting to prevent a litigation against a 2024 social medium platform from going to trial in which the violations of the 2024 social medium platform can be demonstrated to a jury.

Either by a judgment on the pleadings in favor of Affleck or by preceding to trial, the integrity of the US legal and Constitutional system will be upheld, and the Constitutional rights of Americans will be secured.

Dated: __July 22, 2024_____

Respectfully submitted by:

*Jonathan Affleck*

Jonathan Affleck
2816 MLK JR Way
Berkeley, CA 94703
Jonathan.Affleck@protonmail.com
(617) 276-5788

---

[12]   Affleck is willing to state out loud what Constitutional Scholar and Columbia University Professor Philip Hamburger circumspectly implies. See *Netchoice v. Paxton*, Brief of Professor Philip Hamburger as *Amicus* Curiae.

Exhibit A

**A treatise on electric law, comprising the law governing all electric corporations, uses and appliances, also all relative public and private rights**

§ 2          TERMS AND DEFINITIONS.

hibited by various substances, and also to the phenomena themselves." [1]

§ 2. **Telegraph and telegram defined.**— The terms " telegraph " and " telegram " are from the Greek, the former signifying to write afar, and the latter, a writing afar. The telegraph is the apparatus, and the latter is the writing, communication or intelligence itself. The word " telegraph " is

[1] Imperial Dictionary cited in Spensley v. Lancashire Ins. Co., 54 Wis. 433, 442, 11 N. W. 894. In this connection it is further said in this work: " We are totally ignorant of the nature of this cause — whether it be a material agent or a property of matter. But as some hypothesis is necessary for explaining the phenomena observed, it has been assumed to be a highly subtle, imponderable fluid, identical with lightning, which pervades the pores of all bodies, and is capable of motion from one body to another. * * * Electricity, when accumulated in large quantities, becomes an agent capable of producing the most sudden, violent and destructive effects, as in thunder storms; and even in its quiescent state it is extensively concerned in the operations of nature."

It is also defined as " an imponderable and invisible agent producing various manifestations of energy, and generally rendered active by some molecular disturbance, such as friction, rupture or chemical action." Standard Dictionary.

" A power in nature, often styled the electric fluid, exhibiting itself when in disturbed equilibrium or in activity by a circuit movement, the fact of direction in which involves polarity, or opposition of properties in opposite directions; also, by

attraction for many substances, by a law involving attraction between surfaces of unlike polarity and repulsion between those of like; by exhibiting accumulated polar tension when the circuit is broken; and by producing heat, light, concussion, and often chemical changes when the circuit passes between the poles or through any imperfectly conducting substance or space. It is evolved in any disturbance of molecular equilibrium, whether from a chemical, physical, or mechanical cause." Webster's Unabridged Dictionary.

" A highly subtle power, often called the electric fluid, which apparently pervades all bodies; more strictly one of the forms of energy exhibited in lightning, the electric spark, electric current." Stormouth's English Dictionary.

" The name used in connection with an extensive and important class of phenomena, and usually denoting either the unknown cause of the phenomena or the science that treats of them." Imperial Dictionary.

" A natural force utilized mainly for the production of heat, light and power." Bouvier's Law. Dict.

The English Electric Lighting Act of 1882, 45 and 46 Vict., c. 56, § 32, defines the expression " electricity " as meaning " electricity,

2

sometimes, though this meaning is declared by one authority to be " rare," used as a telegraphic despatch or message, or as synonymous with " telegram." In its broadest sense the term " telegraph " includes any apparatus whereby intelligible messages are transmitted to a distance by signals, by compressed air in tubes, by hydraulic pressure, by a heliotrope or any other system of signaling. It has, however, come to have a more specific and restricted meaning, and it is in this latter sense that the term is used herein, and it may, therefore, be defined as a wire or wires and any connecting apparatus used for the purpose of transmitting intelligence, communications or messages by means of electricity. This also includes any casing, coating, tube or pipe inclosing the same. The last definition may be extended so as to embrace any apparatus with or without such wire, or any apparatus other than such wire, whereby messages, intelligence or communications may be electrically transmitted. A telegram is that writing, communication, intelligence or message which is transmitted or intended for transmission by telegraph.[2]

electric, current or any like agency."

In a case in Pennsylvania it is said in this connection: " Whatever electricity may be it seems to be absolutely within the power and under the control of the company that brings it into being. It is compelled by the process employed to come into being. It is secured, stored, poured out, or liberated at will. Its manifestations are both seen and felt. It moves with incredible velocity and power. It carries the tone and inflections of the human voice, or moves loaded cars, depending on the volume of the current and the manner of its application. It may be in the hands of the physician, a soothing remedial agent, and, in the hands of the law, an instrument of execution swifter and surer than the headsman's axe. It may be too

early to say just what it is." Commonwealth v. Northern Elec. L. & P. Co., 145 Pa. St. 105, 118, 22 Atl. 839, 14 L. R. A. 107 per Mr. Justice Williams.

[2] With the exception of the words " with or without such wire " (which are intended to cover the Marconi system of wireless telegraphy, noticed hereafter in this note), the definitions of " telegraph " and " telegram," last above given, are substantially those of the English Telegraph Acts of 1863 (26 and 27 Vict., c. 112), and Act of 1869 (32 and 33 Vict., c. 73), as stated and construed by Stephen, J., in Attorney-General (Informant) v. The Edison Teleph. Co. of Lond., Lim., Exchequer Div., 1880, 43 Law Times, 687, 2 Am. Elec. Cas. 440, 443, where there is an extended description of the telephone and discussion concerning the same with

3

§ 3.   **Wireless telegraphy.**— In the definition of a telegraph given in the last section, we have used the words " with or without such wire," and " other than such wire," having in reference to the telegraph, and it is there said: " The result of the definition seems to be that any apparatus for transmitting messages by electric signals is a telegraph, whether a wire is used or not, and that any apparatus of which a wire used for telegraphic communication is an essential part is a telegraph whether the communication is made by electricity or not. It would include on the one hand electric signals made, if such a thing were possible, from place to place through the earth or air, and on the other, a set of common bells worked by wires pulled by the hand if they were so arranged as to constitute a code of signals." Id. 443, 444.

" (Greek *tele*, afar, and *gramma*, a writing.) The correct form would be telegrapheme, a telegraphic message or despatch. Telegraph means to write from a distance, telegram the writing itself executed from a distance." Vol. 6, Century Dict., p. 6213.

" (Greek, *tele*, afar, and *gramma*, a writing), an apparatus for transmitting intelligible messages to a distance. In this general sense it includes the original semaphore telegraphs; mechanical telegraphs for sending messages short distances, as from the pilot-house to the engine-room of a steamer; pneumatic telegraphs in which compressed air in a tube serves to transmit a message; hydraulic telegraphs in which a column of water takes the place of air in the tube; flashing lights as from a heliotrope and any appliance for signaling, as flags or lanterns. Nearly all these appliances are recognized as signaling apparatus and are now so called. * * * In its later and more restricted sense the name is applied to some form of apparatus employing electricity and transmitting more than mere calls or signals." Vol. 6, Century Dict., p. 6213.

" Any apparatus or device for transmitting messages or signals to a distance, especially any telegraph instruments." " Telegram, a message or other communication transmitted by telegraph." Standard Dict., p. 1850.

" Telegraph is sometimes used as a telegraphic message or despatch," but rarely. Vol. 6, Century Dict., p. 6213.

" Telegraph, a telegraphic despatch or telegram." Standard Dict., p. 1850.

" Telegraph (Greek *tele*, far, far off, and *graphein*, to write), an apparatus, or a process for communicating intelligence rapidly between distant points, especially by means of preconcerted visible signals, representing words or ideas, or by means of words and signs transmitted by electro-magnetism. * * * Electric telegraph or electro-magnetic telegraph, a telegraph by which an operator at one station causes words or signs to be recorded or exhibited at another by means of a current of electricity, generated by a battery and transmitted over an intervening wire. " Telegram (Greek *tele*, far, and

4

view the recent experiments of Signor Marconi with wireless telegraphy. At the present time no legal propositions upon this subject have arisen in this country, nor, as we believe, has

*gramma*, that which is written, from *graphein*, to write), a message sent by telegraph; a telegraphic despatch. * * * Telegraph means to write from a distance; telegram, the writing itself executed from a distance." Webster's Unabridged Dict., p. 1359.

"Telegraph; an instrument to write at a distance. The term is specifically applied to apparatus for communicating intelligence to a distance in unwritten signs addressed to the eye or ear, and has only recently had application to those wonderful combinations of inanimate matter, which literally write at a distance the intelligence committed to them." 23 Ency. Brittan. (9th ed.), "Telegraph."

"The telegraph (from two Greek words signifying 'to write afar') is an apparatus by means of which intelligence is communicated to a distance. Properly it includes the various methods of signaling, but generally it is confined to the magneto-electric telegraph first brought into practical use May 27, 1844, between Washington and Baltimore." 6 Wait's Act. and Def., p. 1, § 1.

A telegraph is "any apparatus for transmitting messages by means of electric currents and signals." Davis v. Pacific Teleph. & Teleg. Co., 127 Cal. 312, 316, 59 Pac. 698, per Henshaw, J.

A telegraph is "any apparatus or adjustment of instruments for transmitting messages or other communication by means of electric currents or signals."

The Chesapeake & Potomac

Teleph. Co., etc. v. The Baltimore &. Ohio Teleg. Co., etc., 66 Md. 399, 2 Am. Elec. Cas. 416, 418, per Alvey, C. J.

"The 'Telegraph' is now usually accepted and in common parlance is generally understood as referring to the entire system of appliances used in the transmission of telegraphic messages by electricity, consisting of: First, a battery or other source of electricity power; secondly, of a line wire or conductor for conveying the electric current from one station to another; thirdly, of the apparatus for transmitting, interrupting, and, if necessary, reversing the electric current at pleasure, and fourthly, of the indicator or signalizing instrument." Hockett v. State, 105 Ind. 250, 2 Am. Elec. Cas. 12, 13, per Niblack, C. J., citing Imperial Dictionary, title "Telegraph."

"There are two classes, the electrome-chemical telegraphs, or those in which the messages are received by means of some mechanical device, operated by electricity, and the electro-chemical telegraphs, in which the message is received and recorded by means of some chemical effect, produced by electricity, the messages in both systems being sent or transmitted by some mechanical means. * * * The telegraph consists essentially of: (1) a line-wire, or main conductor; (2) a battery, or other source of electricity; (3) a transmitting instrument or device for connecting or disconnecting the line-wire with the battery or for changing the polarity of the

5

congressional aid been secured. We have, however, considered the matter of sufficient importance here to insert the subjoined note.[3]

current sent over the line-wire; and (4) a receiver or indicating or recording apparatus." Vol. 6, Century Dict., p. 6213.

" Every electric telegraph consists of a battery or dynamo as the source of electricity, an insulated wire, single or compound, joining the two points; the transmitter or key for the signals and the receiver for the message. The line-wire is commonly borne on poles, but sometimes carried through an underground conduit, especially in city streets. It is usually grounded at both ends, the earth being utilized as a return circuit." Standard Dict., p. 1850.

[3] The following description of the Marconi system is taken from the New York Sun, as given by Signor Guglielmo Marconi:

" The Marconi system is based upon the utilization of the Hertzian magnetic waves which travel through the luminiferous ether with the velocity of light, and, in fact, were declared by their discoverer, Prof. Hertz of Carlsruhe, to be identical with light, except that the waves are of greater length. Whenever an electric spark is made to jump from one electrode to another, these waves are produced, and their rapidity may be varied by variations in the spark-producing apparatus, so that instruments used for sending and receiving signals through their medium can be attuned to one another and made invulnerable to the attacks of other waves of dissimilar periods. Wherever these magnetic waves reach

they affect all magnetic material, and thus make it possible to use them as a means of carrying messages. Prof. Hertz also discovered that the waves which bear his name, although radiated like light, in all directions, if set into motion from a free source can be reflected and directed, just as light is, by means of mirrors. If, therefore, you imagine an electric circuit in a house, with a key in it, just like an ordinary Morse telegraph circuit, you have the basis of Mr. Marconi's system. This circuit runs through a spark coil with an oscillator or interrupter, to produce continuous sparking so long as the circuit is kept closed by the key, and from this the secondary or sparking wire runs out of doors and to the pole from which the messages are to be sent. The two ends of the wire terminate in small metal spheres, between which the sparks pass. When Mr. Marconi began his experiments this was the complete form of his sending apparatus, and readable signals could only be sent a few yards. In his present form of apparatus one of these wires is extended to the earth, and the other has an extension carried vertically into the air, and the length of this latter wire bears a direct relationship to the distance over which signals can be sent. Mr. Marconi also found the basis of his receiving apparatus already invented for him by Prof. Calzecchi Onesti of Fermo and improved and modified by others. This receiver is what is known as a coherer. The idea upon

6

**§ 4.   Submarine telegraph or cable defined.—** A submarine telegraph or cable is a telegraphic line laid under any body of water for the purpose of connecting stations separated thereby and of establishing telegraphic communication between them. Such telegraph or cable is formed by inclosing a wire or wires with an insulating, or protecting material impervious to water.[4]

which it is made is that if you take an electrically conducting material like iron and break it up into small particles like filings the intervals which separate these particles would prevent the mass from allowing any current from passing through. Now, if you were to bring a magnet near to the mass of filings, each particle would become magnetic, draw itself close to its neighbors, and the mass would become so solidified as to establish through it an electrical channel. For his receiving instrument Marconi uses just such an instrument. It consists of a small glass tube four centimeters long, partly filled with filings of nickel and silver. At either end of this tube and reaching into the mass of filings is a terminal wire of an ordinary Morse relay magnet circuit. One wire runs to the ground and the other connects with the magnet, the battery and the ground. The armature of the relay magnet opens and closes a strong local circuit, which in turn operates a recording instrument and also a little hammer which continually taps the coherer to shake the filings apart when they are not being held by magnetic attraction. The coherer is set up on a pole side by side with the sparking spheres, with a similar vertical conductor. The Hertzian waves have the quality of a magnet in causing the filings in

the tube to adhere to one another, and the manner of the operation of the system is simple. The operator presses his key, just as in ordinary telegraphing, making his alphabet in dots and dashes. As the waves shoot out and with the velocity of light reach the receiving station miles away, the filings in the coherer there draw together, and a current passes through them which draws up the armature of the relay magnet. This closes the circuit of the recording instrument, and although the tapper is set to work to shake the filings apart, the magnetic waves come to it with such rapidity, each one re-establishing the coherence, that the slower acting recording instrument is not disturbed, and it continues to record the signal so long as the far-away operator keeps his finger on the key. The tuning of the coherer to waves of different frequencies is done by attaching to each end of it a copper strip, and the length of these strips determines their susceptibility to different wave tones, just as the length of an organ pipe fixes its note. Mr. Marconi said it had been discovered that the distance over which he could transmit messages depended upon the height of the vertical wires put up at the receiving and sending stations."

[4] " A telegraphic line, consisting of one or more conducting wires, inclosed by an insulating or protect-

7

§ 4a.   **Telegraph stations defined.**— " Telegraph stations " has been defined as meaning ordinary offices for the business of telegraphy at cities or villages along the line of road.[5]

§ 5.   **Telephone defined.**—The word telephone is from the Greek (*tele,* afar, and *phone,* sound), and may be defined as a wire, whether encased or otherwise, and all connecting apparatus and instruments used for the transmission of articulate speech, by means of electricity or electrical devices. A broader definition would include instruments for reproducing sound over a conducting wire or cord.[6]

ing material, so as to form a strong cable impervious to water, to be laid under water in order to connect stations, which are separated by a river, strait or other body of water." Webster's Unab. Dict., p. 1359.

" Submarine or electric-telegraph cable, a cable composed of a single wire or a strand of wires of pure copper, embedded in protecting substances, and covered externally by coils of coated iron wire for conveying telegraphic messages under water. The copper wire, or embedded strand of wires, is called the core, and is insulated by layers of gutta percha or India rubber, each layer being separated from the next by a coating of resinous matter. The insulating layers are generally separated from the outer wires by a padding of jute or kemp, saturated with tar or other protective substances." 1 Cent. Dict., p. 748.

" A subaqueous conductor composed of a core of high conductivity, surrounded by insulating material, which is protected by a layer of wire, covered with a water-proof coat — a submarine telegraph." Standard Dict., p. 261.

Congress on February 29, 1888,

passed an act (25 Stat. L. 41), to protect submarine cables, such act being intended to carry into effect the International Convention, for the protection of submarine cables, made at Paris, May 14, 1884, and proclaimed by the President of the United States, May 22, 1885, but the act was declared to apply only to cables which the convention for the time being applied. See § 81a and note herein.

Under the Post Roads Act, telegraph lines are permitted to be laid under the navigable streams or waters of the United States.

[5] Railroad Company v. Telegraph Company, 38 Ohio St. 24, 30.

[6] " An instrument or apparatus for the transmission of sound to a distant point. The word is generally restricted to devices for the transmission of articulate speech by the agency of electricity." Century Dict., p. 6216.

"(Greek, *tele,* afar, and *phone,* sound.) An instrument for reproducing sounds, especially articulate speech, at a distance, by the aid of electricity or electro-magnetism. It consists essentially of a device by which currents of electricity, produced by the sounds, and exactly corresponding in duration and in-

8

Exhibit B

Crawford, Susan P., Transporting Communications (August 25, 2008). Boston University Law Review, Vol. 89, pp. 878-879, 2009

878          *BOSTON UNIVERSITY LAW REVIEW*          [Vol. 89:871

A.   *Common Carriage*

1.   History

"Common carriage" for communications networks has its roots in two very different sources of law: the law of bailment, under which carriers were responsible for the goods they carried, and the law of franchise and monopoly, under which companies allowed by the state to provide general communications or transport networks were required not to discriminate and to serve each comer equally.[18]   Following the first of these two threads, from which the label "common carriage" came to communications without its underlying meaning, common carriers of goods had been treated as insurers, responsible for the goods they were carrying.  This strict liability approach was supposed to make carriers more responsible, and did not necessarily carry with it a duty to serve all comers or serve them equally.[19]

Following the second thread, from which the meaning (but not the label) of "common carriage" came, certain basic transportation businesses (e.g., operators of ports or cranes through a license with the sovereign) historically had a duty to serve all comers and serve them equally.[20]   The content of these non-discrimination rules (again generally) was that the franchisee or other transportation network provider must "grant access to their property on equal terms without discriminating among applicants."[21]   Such non-discrimination rules were applied to telegraphy providers from the mid-nineteenth century onwards, and to telephony providers when they started business in the late-nineteenth century.[22]

An 1848 New York statute regulating telegraphy providers stated, for example:

It shall be the duty of the owner or the association owning any telegraph line, doing business within this state, to receive dispatches from and for

---

[18] *See* WILLIAM JONES, THE COMMON CARRIER CONCEPT AS APPLIED TO TELECOMMUNICATIONS: A HISTORICAL PERSPECTIVE 9-10 (1980), *available at* http://www.cybertelecom.org/notes/jones.htm; Thomas B. Nachbar, *The Public Network*, 17 J. COMM. L. & POL'Y 67, 83 (2008).

[19] *See* JONES, *supra* note 18, at 10.  The FCC came to the same conclusion as to this history in its 1981 proceeding.  Policy and Rules Concerning Rates for Competitive Common Carrier Services and Facilities Authorizations, 84 F.C.C.2d 445, ¶ 8 (1981) [hereinafter *FCC 1981 Rules*].  Private carriers would not have been liable as insurers, but "common carriers" would have been.  *See id.* ¶ 123, at 493.

[20] See Matthew Hale's 1670 description of port facilities, bridges, ferries, and the like as being private businesses that are nonetheless "affected with the public interest."  Munn v. Illinois, 94 U.S. 113, 127-29 (1876) (citing Bolt v. Stennett, (1800) 101 Eng. Rep. 1572, 1573).

[21] Nachbar, *supra* note 18, at 70 (citing Interstate Commerce Comm'n v. Balt. & Ohio R.R. Co., 145 U.S. 263, 275 (1892)).

[22] *See* JONES, *supra* note 18, at 12.

other telegraph lines and associations, and from and for any individual, and on payment of their usual charges for individuals for transmitting despatches [sic], as established by the rules and regulations of such telegraph line, to transmit the same with impartiality and good faith, under penalty of one hundred dollars for every neglect or refusal to do so . . . .[23]

Similarly, a statute from 1850 provided:

Any person connected with a telegraph company . . . who shall wilfully [sic] divulge the contents, or the nature of the contents, of any private communication entrusted to him for transmission or delivery, or who shall willfully refuse or neglect to transmit or deliver the same, shall . . . be adjudged guilty of a misdemeanor . . . .[24]

Virginia, Michigan, Connecticut, Illinois, California, Maryland, Missouri, Kentucky, Louisiana, Wisconsin, Massachusetts, Pennsylvania, and Iowa, among other states and territories, all passed laws in the mid-nineteenth century that incorporated non-discrimination obligations directed at telegraphy companies.[25]

Thus, telegraph companies had duties to serve all upon reasonable terms – even if they were not common carriers for purposes of liability, and even if they were tiny systems with no possibility of dominating any market.[26] When telephone companies started doing business in the 1870s, similar non-discrimination obligations were imposed on them by state[27] and federal law.[28]

### 2. Common Carriage and Communications Statutes

The shift that applied the label of "common carriage" status to communications companies in this country occurred because railroads played both carrier roles – they both carried goods *and* were in the transportation business to which non-discrimination obligations traditionally applied. Railroad law was the precedent for communications law when the Interstate Commerce Commission ("ICC"), then responsible for railroad regulation, took on the responsibility of telephony under the Mann-Elkins Act of 1910.[29]

---

[23] Act of Apr. 12, 1848, ch. 265, 1848 N.Y. Laws 392, 395.

[24] Act of Apr. 10, 1850, ch. 340, 1850 N.Y. Laws 739, 739.

[25] JONES, *supra* note 18, at 32.

[26] It is important to note that domestic telegraph systems were usually state owned at this point in all developed countries other than the United States and Canada. *See* Robert Pike & Dwayne Winseck, *The Politics of Global Media Reform, 1907-23*, 26 MEDIA, CULTURE & SOC'Y 643, 645 (2004).

[27] JONES, *supra* note 18, at 44.

[28] *Id.* at 37 (discussing 1860, 1864, and 1888 federal legislation requiring non-discrimination).

[29] Mann-Elkins Act, ch. 309, 36 Stat. 539, 544-45 (1910) (codified as amended at 47 U.S.C. § 601 (1934)). The ICC was created by the Interstate Commerce Act of 1887; the