## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Civil Action No.: 1:24-cv-10802-AK

Jonathan Affleck
2991 Sacramento St. #296
Berkeley, CA 94703
Jonathan.Affleck@protonmail.com
(617) 276-5788

  Jonathan Affleck

     Plaintiff

         v.             ORAL ARGUMENT REQUESTED

  The Harvard Crimson
  Inc (Harvard Crimson)

     Defendant

### PLAINTIFF AFFLECK'S MOTION FOR ALTERATION OR AMENDMENT OF THE ORDER OF DISMISSAL AND FOR LEAVE TO FILE AN AMENDED  COMPLAINT PURSUANT TO FED. R. CIV. P. 59 (e)

### Preamble

Plaintiff Jonathan Affleck ("Plaintiff" or Affleck) humbly petitions this honorable court to alter or to amend the motion of dismissal to grant him leave to file an amended complaint pursuant to Fed. R. Civ. P. 59 (e) for the following reasons.

### Reasoning

#### Contract Breach and Obvious Bad Faith

1. In a Rule 12b dismissal, "factual allegations must be accepted as true, while legal conclusions are not entitled to credit [Dkt. 27, p. 4]." Mr. Affleck alleges as fact that the Crimson is a common carrier of information provided by another information content provider and demonstrates obvious bad faith by breach of the implied-in-fact contract of common carriage [Dkt. 1 p. 7 ¶ 31] through discriminatory removal of Mr. Affleck's content and by denial of service to Mr. Affleck.[1]

   A common carrier of content is neither a speaker nor a publisher of transported content, and the bad faith, which is associated with breaking the implied-in-fact contract of common

---

[1] Even in pre-Internet days, a corporation could publish a newspaper and provide common carriage of messages among subscribers to the newspaper. The corporation's common carriage business would have been subjected to common carriage law while the corporation's newspaper business was not subject to common carriage law. If the corporation did not want its message transport business to be subject to common carriage law, the corporation could become a private carrier of messages. The Crimson's comment content is not even stored in the same Crimson database that contains newspaper article content. The comment database is contained in a 3rd party data warehouse. The Crimson maintains obvious separation of its newspaper service from its comments service.

carriage negates the shield of 47 U.S. Code § 230. The dismissal neither acknowledges nor takes cognizance of Mr. Affleck's allegation of fact. Nothing in § 230 indicates that Congress intended an ICS to be able to make a contract that the ICS can break with impunity. Making a contract with the intention of breaking the contract is bad faith. If Congress had intended for § 202 not to apply to an ICS, Congress could have stated this intention in § 230 or in § 202.

At present, the Court of Appeals for the Fifth Circuit holds that a social medium platform is a common carrier while the Court of Appeals for the Second Circuit allows NY State to treat an ISP/ICS as a common carrier even though the statute (the ABA, see below) does not call an ISP/ICS a common carrier.

The Supreme Court had the opportunity to rule in the Netchoice litigation that  a social medium platform service never provides common carriage but did not do so. The primary controversy of Mr. Affleck's complaint remains an open question that must be adjudicated. This primary controversy is the Crimson's breach of its implied-in-fact contract

  a.    that assumpsit creates between the Harvard Crimson and the public [Dkt. 14 p.6 ¶1 *et seq.*] and

  b.    that obligates the Harvard Crimson to provide non-discriminatory common carriage service.

47 U.S. Code § 230 does not preempt contract law, and appellate rulings indicate that § 230 is consistent with federal common carriage law (e.g. § 202) and thus with state common carriage law.

The Supreme Court reviewed the appellate ruling of *NetChoice, LLC v. Paxton*, 49 F.4th 439 (5th Cir. 2022)[2] and did not address the common carriage argument probably because neither Texas HB 20, Fla. Stat. §106.072, nor Fla. Stat. §501.2041 is really a common carriage statute like MGL c. 159 §§ 1-2 (see below). The appellate ruling from the Fifth Circuit summarizes the common carrier status of a social medium platform.

> To state the obvious, the Platforms are communications firms. The Platforms  halfheartedly suggest that they are not "members of the 'communications industry' " because their mode of transmitting expression differs from what other industry members do. But that's wrong. The whole purpose of a social media platform—as aptly captured in HB 20's definitional provisions—is to "enable[ ] users to communicate with other users." TEX. BUS. & COM. CODE § 120.001(1). The Platforms' own representations confirm this—for example, Facebook's Terms of Service indicates its purpose is to enable users to "communicate with friends, family, and others."[25] In that sense, the Platforms are no different than Verizon or AT&T.
>
> > [25] Facebook Terms, § 1; *see also* Twitter Terms, § 3 (purpose of Twitter is to host "Content" and "communications").
>
> The Platforms also hold themselves out to serve the public.[26] They permit any adult to make an account and transmit expression after agreeing to the

---

[2] The Crimson comments service does not serve as many users as the Platforms, which the Court of Appeals for the Fifth Circuit addresses, but common carriage status does not depend on the size of the carrier, and the Crimson is not merely a student club. The Crimson is a medium size business with at least $30 million in assets and an international readership.

same boilerplate terms of service. They've thus represented a "willingness to carry [anyone] on the same terms and conditions." *Semon v. Royal Indem. Co.* , 279 F.2d 737, 739 (5th Cir. 1960).

> [26] Indeed, one Platform has described its purpose as "to serve the public conversation." *Senate Hearings, supra* , at 1 (statement of Jack Dorsey, CEO, Twitter, Inc.).

The Platforms resist this conclusion, arguing that they have not held themselves out to serve the public equally. That's so, they contend, because they are only willing to do business with users who agree to their terms of service. But requiring "compliance with their reasonable rules and regulations" has never permitted a communications firm to avoid common carrier obligations. *Chesapeake* , 7 A. at 811. The relevant inquiry isn't whether a company *has* terms and conditions; it's whether it offers the "*same* terms and conditions [to] any and all groups." *Semon* , 279 F.2d at 739 (emphasis added). Put differently, the test is whether the company "make[s] individualized decisions, in particular cases, whether and on what terms to deal." *FCC v. Midwest Video Corp.* , 440 U.S. 689, 701, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979) (quotation omitted). Here, it's undisputed the Platforms apply the same terms and conditions to all existing and prospective users.

The Platforms also contend they are not open to the public generally because they censor and otherwise discriminate against certain users and expression. To the extent the Platforms are arguing that they are not common carriers because they filter some obscene, vile, and spam-related expression, this argument lacks any historical or doctrinal support. For example, phone companies are privileged by law to filter obscene or harassing expression, and they often do so. 47 U.S.C. § 223 ; *see, e.g., Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.* , 827 F.2d 1291, 1292 (9th Cir. 1987). Yet they're still regulated as common carriers. Similarly, transportation providers may eject vulgar or disorderly passengers, yet States may nonetheless impose common carrier regulations prohibiting discrimination on more invidious grounds. *E.g., Williams v. Trans World Airlines* , 509 F.2d 942, 948 (2d Cir. 1975).

The Platforms nonetheless contend that they cannot be regulated as common carriers because they engage in viewpoint-based censorship—the very conduct common carrier regulation would forbid. This contention is upside down. The Platforms appear to believe that any enterprise can avoid common carrier obligations by violating those same obligations. That is obviously wrong and would rob the common carrier doctrine of any content.

Mr. Affleck's previous complaint did not accuse the Harvard Crimson of denial of common carriage. Judge Stearns held that an ICS is not a common carrier of merchandise or other property and has no associated monetary penalty.

To provide common carriage, a common carrier does not have to be a common carrier of merchandise or other property. A public telephone service is a common carrier of voice but is not a common carrier of merchandise or other property. The Harvard Crimson is a common carrier of third-party content even if the Massachusetts category of common

carrier of merchandise and other property does not exist in the US Federal Code of Law.

Judge Stearns dismissed the previous complaint not because an ICS was not a common carrier but because according to federal law Mr. Affleck could not obtain monetary relief. Judge Stearns was correct according to federal law, but a Massachusetts court has always held that a message is property of the person, who creates the message, and penalizes a transport service for non-performance either according to common law or according to statutory law [Dkt. 24 p. 7 li. 2]. The Massachusetts penalty is paid to the victim of non-performance, and Mr. Affleck requested supplemental jurisdiction over Massachusetts state law.

In other words, Massachusetts has created a statutory penalty for the aforesaid contractual breach, which can be enforced in federal law according to 47 U.S. Code §§ 202,207. The Supreme Court of the United States has explicitly stated,

> There is no body of Federal common law, separate and distinct from the common law existing in the several States, in the sense that there is a body of statute law enacted by Congress separate and distinct from the body of statutes enacted by the several States. The principles of the common law are operative upon all interstate commercial transactions, except so far as they are modified by Congressional enactment. *Western Union Tel. Co. v. Call Pub. Co.*, 181 U.S. 92, 21 S. Ct. 561 (1901).

The above passage seems to be equivalent to stating that the common law of common carriage is based in contract law and that the federal government will enforce the implied-in-fact contract of common carriage in interstate commerce.[3]

In this litigation, the assumpsit of communications common carriage intrinsically involves questions both of preemption and also of equal protection and due process because the federal courts seem to be interpreting applicable Title 47 statutes in diametrically opposed ways when an information content provider is a powerful corporation like Netflix (*N.Y. State Telecomms. Ass'n v. James*) and when the information content provider is an ordinary user like Mr. Affleck.

No one argues that an ISP is not an ICS. The caselaw of 47 U.S. Code § 230 seems to teach that an ISP has the right to restrict the content of an Internet Content Provider like Netflix. Yet, the Court of Appeals for the Second Circuit explicitly allows state regulation of an ISP/ICS by the Affordable Broadband Act (ABA) to stop such restriction of content. If the ABA can apply to an ISP that is an ICS, MGL c. 159 §§ 1-2 should be able to apply a social medium platform that is an ICS.

The analysis below demonstrates that the active refusal of Massachusetts to enforce its own common carriage antidiscrimination law transforms the Harvard Crimson into a state-actor that abridges speech in violation of the First Amendment and of 42 U.S. Code § 1983.

### *State and Federal Definitions of Communications Common Carriage*

The Crimson comments service, which is a social medium platform, is a common carrier of a

---

[3] The Supreme Court has ordered a lower court not to enforce contractual discrimination in *Shelley v. Kraemer*, 334 U.S. 1, 68 S. Ct. 836 (1948). The Supreme Court does not seem ever to have ruled that a lower court should not enforce contractual antidiscrimination.

message according to the FCC's functional common carriage test that Court of Appeals for the DC Circuit cites in *Nat'l Ass'n of Reg. Util. Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976) (NARUC I):

> What appears to be essential to the quasi-public character implicit in the common carrier concept is that the carrier "undertakes to carry for all people indifferently . . . ."[58] *Nat. Ass'n of Reg. Utility Com'rs v. F.C.C.*, 525 F.2d 630 (D.C. Cir. 1976).

> [58]*Semon v. Royal Indemnity Co.,* 279 F.2d 737, 739 (5th Cir. 1960); *Home Ins. Co. v. Riddell,* 252 F.2d 1, 3 (5th Cir. 1958); *Ciaccio v. New Orleans Public Belt R.R.,* 285 F.Supp. 373, 375 (E.D.La. 1968); *State v. Sinclair Pipe Line Co.,* 180 Kan. 425, 304 P.2d 930, 941 (1957); *Utilities Comm. v. Gulf Atlantic Towing Corp.,* 251 N.C. 105, 110 S.E.2d 886, 889 (1959).

> The following cases state the test in similar wording, while not finding that a given carrier was a non-common carrier: *Washington ex rel. Stimson Lumber Co. v. Kuykendall,* 275 U.S. 207, 211, 48 S.Ct. 41, 72 L.Ed. 241 (1927); *Terminal Taxicab Co. v. Kutz,* 241 U.S. 252, 255, 36 S.Ct. 583, 60 L.Ed. 984 (1916); *Grace Line, Inc. v. F. M. B.,* 280 F.2d 790, 792 (2d Cir. 1960); *Arrow Aviation, Inc. v. Moore,* 266 F.2d 488, 490 (8th Cir. 1959); *Circle Express Co. v. Commerce Comm.,* 249 Iowa 651, 86 N.W.2d 888, 893 (1957); *State ex rel. Anderson v. Witthaus,* 340 Mo. 1004, 102 S.W.2d 99, 102 (1937); *Ferguson Trucking Co. v. Rogers Truck Line,* 164 Neb. 85, 81 N.W.2d 915, 922 (1957).

> The F. C. C. has expressed a similar view of the common carrier concept as applied to communications. "[T]he fundamental concept of a communications common carrier is that such a carrier makes a public offering to provide, for hire, facilities by wire or radio whereby all members of the public who choose to employ such facilities may communicate or transmit intelligence of their own design and choosing . . .." Report and Order, *Industrial Radiolocation Service,* Docket No. 16106, 5 F.C.C.2d 197, 202 (5 October 1966).[4]

### *Information Service versus Telecommunications Service*

The Court of Appeals for the DC Circuit has acknowledged that an information service can correctly be considered a communications common carrier [Dkt 1 p. 3 ¶ 13 + ftnt. 2] that is unregulated by the FCC even if the communications common carrier is subject to 47 U.S. Code § 202 in the federal courts.

> We nonetheless vacated the anti-blocking and anti-discrimination rules because they unlawfully subjected broadband providers to per se common carrier treatment. *Id.* at 655, 658–59. As we explained, the Communications Act provides that "[a] telecommunications carrier shall be treated as a common carrier ... only to the extent that it is engaged in providing

---

[4] *Nat'l Ass'n of Reg. Util. Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976) (NARUC I) also points out "One may be a common carrier though the nature of the service rendered is sufficiently specialized as to be of possible use to only a fraction of the total population.  And business may be turned away either because it is not of the type normally accepted or because the carrier's capacity has been exhausted."

telecommunications services." *Id.* at 650 (quoting 47 U.S.C. § 153(51) ). The
Commission, however, had classified broadband not as a telecommunications
service, but rather as an information service, exempt from common carrier
regulation. *Id.* Because the anti-blocking and anti-discrimination rules
required broadband providers to offer service indiscriminately—the common
law test for a per se common carrier obligation—they ran afoul of the
Communications Act. *See id.* at 651–52, 655, 658–59. We upheld the
transparency rule, however, because it imposed no per se common carrier
obligations on broadband providers. *Id.* at 659. *U.S. Telecom Ass'n v. Fed.
Commc'ns Comm'n*, 825 F.3d 674 (D.C. Cir. 2016).

The Court of Appeals for the DC Circuit did not object to the classification of Broadband
Internet Access Service (BIAS) in the category of communications common carriage either
when the FCC classified BIAS to be an information service or when the FCC classified
BIAS to be a telecommunications service. According to the federal functional test for
common carriage, BIAS qualifies to be a common carriage service whether BIAS is an
information service or a telecommunications service, but the FCC cannot give BIAS *per se*
common carriage treatment and regulate BIAS in interstate commerce if BIAS is an
information service. Once the FCC reclassified BIAS as a telecommunications service, the
Court of Appeals for the DC Circuit no longer opposed FCC regulation of BIAS in interstate
commerce (47 U.S. Code § 151) as telecommunications common carriage. When BIAS is a
telecommunications service, BIAS is simultaneously an ICS and a communications common
carriage service, and when BIAS is an information service, BIAS is simultaneously an ICS
according to § 230 and a communications common carriage service according to § 202, which
is compatible with MGL c. 159 §§ 1-2 (previously, RL c. 70 §§ 1-2).

MGL c. 159 § 1 applies only to intrastate commerce, which is outside the scope of the FCC
and interstate communications commerce law. MGL c. 159 § 1, which is not a statute of
Title 47 Chapter 5, states the following.

> Every common carrier of merchandise or other property shall receive,
> transport and forward all property offered for such purposes by other such
> carriers as promptly, faithfully and impartially, at as low rates of charge, and
> in a manner and on terms and conditions as favorable to the carrier offering
> such property, as he on the same day and at the same place receives,
> forwards and transports, in the ordinary course of business, property of a like
> description offered by persons other than such carriers. Such carrier shall not
> discriminate against any particular person or subject him to any undue or
> unreasonable prejudice or disadvantage. The supreme judicial or superior
> court shall have jurisdiction in equity to enforce this section.

At present, the issue of preemption and state regulatory authority remains unsettled with
respect to BIAS, and the most recent appellate decision (*N.Y. State Telecomms. Ass'n v.
James*, 101 F.4th 135 (2d Cir. 2024)) states the following.

> Turning to the merits, we conclude as follows. First, the Communications Act
> of 1934 (as amended by the Telecommunications Act of 1996) does not wholly
> preempt states from regulating the rates charged for interstate
> communications services, because the Act does not establish a framework of
> rate regulation that is sufficiently comprehensive to imply that Congress
> intended to exclude the states from entering this field. Second, the ABA is
> not conflict-preempted by the Federal Communications Commission's 2018

order classifying broadband as an information service. That order stripped the agency of its statutory authority to regulate the rates charged for broadband internet, and a federal agency cannot exclude states from regulating in an area where the agency itself lacks regulatory authority. Accordingly, we **REVERSE** the judgment of the district court and **VACATE** the order permanently enjoining enforcement of the ABA.

If "a federal agency cannot exclude states from regulating in an area where the agency itself lacks regulatory authority," Massachusetts should apply Massachusetts common law of common carriage of a message or Massachusetts statutory law of transport of a despatch (MGL c. 166 § 16) as it has done so for over a century. In both cases, Massachusetts imposes a performance penalty that does not seem obviously or inherently connected to interstate telecommunications commerce law. In the case of common carriage of a message, the performance penalty is imposed for breach of the implied-in-fact contract (assumpsit) with the public and not because of *per se* common carriage obligation. Assumpsit is not specific to common carriage.

### State Caselaw of Communications Common Carriage

When MGL c. 159 §1 uses the phrase "common carrier of merchandise or other property," the statute describes a criterion that applies to any common carriage service that is transporting an item and not a person. When statutory penalties were enacted for a Massachusetts common carrier of an item, telegraph service had recently been introduced, and telephone service did not yet exist. After telephone service came into existence, Massachusetts courts interpreted the statutory penalty for denial of common law common carriage of an item not to apply to a voice call even though a Massachusetts court continued to uphold the legality of regulating a local Massachusetts telephone service under common carriage law. A Massachusetts common carrier of a message electrically by wire or by radio means (a telegraph service or the service, which the Crimson comments section provides[5]) is also subject to MGL c. 166 § 16 (Receipt and transmission of despatches), which has superseded RL c. 122 § 9-10, which was substantially the same as MGL c. 159 §§ 1-2 but applies statutorily to a telegraph service like the Crimson comments service). The Supreme Judicial Court of Massachusetts has held in a precedential decision that a claim under RL c. 70 § 1-2 (currently MGL c. 159 §§ 1-2) is essentially identical to a claim under RL c. 122 §§ 9,11.

> The first count was at common law for a refusal to receive and forward the message [R. L. c. 70 § 1-2, which today is M.G.L c. 159 §§ 1-2, Affleck], and the second was under the R. L. c. 122, §§ 9, 11, for the same cause of action. The defendant was engaged in a *quasi* public employment, to be carried on for the accommodation *604 of the community, with a view to the general benefit. It had no right to refuse to receive a proper message, for whose transmission payment was tendered. R. L. c. 122, § *Ellis* v. *American Telegraph Co.* 13 Allen, 226, 231. The only question raised is

---

[5] The legal definition of a telegraph has not changed since the earliest days of telegraph service. A telegraph is "any apparatus for transmitting messages by means of electric currents and signals." *Davis v. Pacific Teleph. & Teleg. Co.*, 127 Cal. 312, 316, 59 Pac. 698, per Henshaw, J. *Davis* is an 1899 decision that cites much earlier decisions for the legal definition of telegraph. A similar definition of telegraph service is used to this day in NY State, which considers transport by the Internet to constitute telegraph service. See N.Y. Comp. Codes R. & Regs. tit. 20 § 527.2(d). The Crimson comments section provides a telegraph service by federal and state law.

whether the giving of the notice by the plaintiff relieved the defendant of its obligation to transmit the message. It was certainly the right of the plaintiff to inform the defendant as to the nature of the message, and its importance from a financial point of view, in order that the nature and particulars of its undertaking might be understood by the defendant, and the obligation that it incurred in reference to damages for a breach of the contract. *Wheelock* v. *Postal Telegraph Cable Co., ubi supra.* Such a notice would furnish no justification for a refusal to send a message, whether it might or might not be a sufficient reason for charging something more than the lowest rate established for the transmission of messages.

See *Bernard* v. *Adams Express Co., ante,* 254. It was intended to show that the damage for a failure properly to send arid deliver the message would probably be substantial, and, under the statute and the rules and regulations of the company, to create a liability that might reach the sum of S100. Such a liability might exist without a special notice if the language of the message sufficiently indicated the importance of a prompt delivery of it, and the loss that would result from a failure to deliver it promptly. Whatever negotiations or proposals or limitations on the part of the defendant might have been warranted by the giving of the notice, the absolute refusal to receive and send the message was unreasonable, and justified a finding for the plaintiff under the first or second count, either under the statute or at common law. *Vermilye v. Postal Telegraph Cable Co.,* 91 N.E. 904 (Mass. 1910).

### *State Inaction Creates State Action and Transforms the Crimson into a State Actor*

Both federal law and also the law of the Commonwealth of Massachusetts are pellucid in the case of the contractual breach, which the Crimson has perpetrated in the common carriage service of its comments section. Not only does § 230 preserve a state cause of action if the cause of action is not inconsistent with § 230, but the FCC does not regulate a communications common carrier that is an information service. Yet, MCAD (Massachusetts Commission Against Discrimination) actively refused to enforce relevant Massachusetts anti-discrimination law when Mr. Affleck brought the Crimson's discrimination and bad faith to MCAD's attention. *Catlette v. United States*, 132 F.2d 902 (4th Cir. 1943) points out that state inaction creates a form of state action that enables violation both of the Fourteenth Amendment and of 42 U.S. Code § 1983 by a state official.

Catlette urges that the information is fatally defective in that it fails to charge the commission of a federal offense, since it does not state that the alleged acts were within the scope of Catlette's authority or committed under color of his authority. This contention, however, was effectively answered long ago by the Supreme Court in Ex parte Virginia, 100 U.S. 339, 347, 25 L.Ed. 676: "Whoever, *by virtue of public position* under the State government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition, and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State." (Italics ours.)

And this principle has been recently reaffirmed in Iowa-Des Moines National Bank v. Bennett, 284 U.S. 239, 246, 52 S.Ct. 133, 76 L.Ed. 265, where it was said: "When a state official, acting under color of state authority, invades, in the course of his duties, a private right secured by the federal constitution, that right is violated, even if the state officer not only exceeded his authority but *disregarded special commands of the state law."* (Italics ours.)

State inaction can transform a private party into a state-actor. By active failure to enforce Massachusetts antidiscrimination law, Massachusetts granted the Harvard Crimson a right or a privilege to violate state law and transformed the Harvard Crimson into a state-actor.

> To establish a § 1983 claim, appellants must also show that they have been deprived of a constitutional right by a person acting under color of state law. Lugar v. Edmondson Oil Co., 457 U.S. 922, 942, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). A private party is considered a state actor if the alleged deprivation was "caused by the exercise of some right or privilege created by the [s]tate or by a rule of conduct imposed by the state or by a person for whom the [s]tate is responsible." Id. at 937, 102 S.Ct. 2744. A state's "[m]ere approval of or acquiescence in the initiatives of a private party" does not amount to state action. Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

By acting under color of law because of Massachusetts' active state inaction (rejection of the MCAD complaint), the Crimson becomes a state actor and unconstitutionally abridges speech both according to the US Constitution and also according to the Massachusetts Constitution.[6] In addition, by active failure to enforce Massachusetts law, Massachusetts enables unconstitutional violation both of due process and also of equal protection.

### *Dismissal on the Basis of an Affirmative Defense Requires More than a Conclusory Assertion by the Defendant*

2.  When the Crimson attempts to use 47 U.S. Code § 230 for an affirmative defense against the complaint, the Crimson must show

    a.  that the Crimson comments service performs neither moderation nor curation, which each separately is a form of the Crimson's expressive action according to *Moody v. NetChoice, LLC*, 603 U.S. ___ (2024) and therefore not protected according to 47 U.S. Code § 230(c)(1),

    b.  that the Crimson provides neither a federal communications common carriage service, Massachusetts common carriage service, nor a Massachusetts telegraph service,

    c.  that the Crimson is not violating common carriage assumpsit by breaching the Crimson's implied-in-fact contract with the public (obvious bad faith) and therefore not protected according to 47 U.S. Code § 230(c)(2), and that

    d.  that the Crimson is in compliance with 47 U.S. Code § 202, which requires that the Crimson comment service only remove content according to the non-discriminatory common carriage criteria either of unfitness or of fullness [Dkt. 14 li. 4 *et seq*.].[7]

---

[6] Article LXXVI of Articles of Amendment of the Massachusetts Constitution has superseded Article XVI.

[7] The Crimson could, of course, simultaneously fulfil its implied-in-fact contractual obligations of common carriage in its comments section while the Crimson also provided a curated and moderated data feed that would expose the Crimson to legal liability for false advertising or libel, etc. Note that an internet content provider of a blog hosting service is not a communication common carrier because he only curates and moderates his backend database of posts and messages while a hosting service provides common carriage. Evidence to explain this sort of distinction can be developed

### *Consistency of Mr. Affleck's Complaint with Existing Caselaw*

3. Nothing in Mr. Affleck's complaint is clearly in conflict with any appellate ruling cited in the memorandum, which accompanies the order for dismissal, because none of the caselaw reviewed a litigation that was based on violation of the implied-in-fact contract of common carriage.

   Removal of content may be a traditional editorial function, but removal or delay of content is a traditional communications common carrier violation as well as violation of the implied-in-fact contract of common carriage.

   a. Historically this violation has been punished harshly, and

   b. NY state currently punishes an ICS for this violation with respect to streaming content,

   To avoid the common carriage violation, an ICS could either obey common carriage law, which allows removal of content for unfitness and not by editorial discretion, or could avoid meeting the common law definition of a common carrier by becoming a private carrier.

   *Sikhs for Justice, Inc. v. Facebook*, 697 Fed. App'x 526, 526 (9th Cir. 2017) addresses a complaint that included allegation of extraterritorial public accommodation discrimination and that is indefinite with respect to the place of public accommodation. Mr. Affleck's count of public accommodation discrimination avoids extraterritoriality, and the place of public accommodation is clearly defined from the standpoints both of federal law and of Massachusetts law.

### *The Crimson's Comment Section is a Public Accommodation both by Federal Law and State Statute*

4. By federal law, the Crimson website is an establishment within the Internet, which belongs to the class of "[e]stablishments affecting interstate commerce or supported in their activities by State action as [*as* indicates simile] places of public accommodation (42 U.S. Code § 2000a(b) [Dkt. 1 p. 4 ¶ 15])." The Internet is also a public facility, and the Crimson has set up its comments service to be part of the public facility [Dkt. 1 p. 5 ftnt. 7] (42 U.S. Code §§ 2000b, 2000b-2) or of the government-designated public forum (47 U.S. Code § 230(a-b)) of the Internet. The Crimson has by assumpsit waived its right to the expressive action of removing content from its comments service because the Crimson comments service provides common carriage, and *Hurley v. Irish-American Gay, Lesbian Bisexual Group*, 515 U.S. 557, 115 S. Ct. 2338 (1995) provides no support to justify the Crimson's breach of its common carriage contract with the public.

   Massachusetts law against discrimination in a place of public accommodation defines a place of public accommodation (MGL c. 272 § 92A) to include "(3) a gas station, garage,

---

during discovery and trial. So far little litigation, which is related to 47 U.S. Code § 230, has developed much of a trial record that is suitable for review by a higher court with respect to the issues, which Mr. Affleck raises. The Supreme Court has alluded to this problem in its Netchoice rulings. "The parties have not briefed the critical issues here, and the record is underdeveloped. So we vacate the decisions below and remand these cases. That will enable the lower courts to consider the scope of the laws' applications, and weigh the unconstitutional as against the constitutional ones." *Moody v. NetChoice, LLC*, 603 U.S. ___ (2024).

retail store or establishment, including those dispensing personal services…" The addition of the phrase "or establishment" prevented a mail order retail establishment like Montgomery Ward, J.C. Penny, Sears, or Spiegel, which did not always sell through a brick-and mortar retail store, from discriminating against a protected class. The phrase "retail establishment" fits ongoing internet development in which transactions, speech, exhibition, and display are all moving entirely online. The Crimson website is a retail establishment within the Internet, which is the largest retail establishment that has ever been created.

The Crimson website is not only an ICS according to federal caselaw, but the Crimson comments section is both a public facility under federal law and also a place of public accommodation both under federal law and also under Massachusetts statutes.

If 47 U.S. Code § 230 really overrides public accommodation antidiscrimination law without any mention of specifically overridden statutes, § 230 negates all public accommodation antidiscrimination law because a place of public accommodation could require a reservation through a social medium platform that denied service to every member of a protected class.

## Conclusion

Mr. Affleck submits the accompanying draft amended complaint in support of this motion.

WHEREFORE, for the foregoing reasons, the Plaintiff respectfully prays that this Court alter or amend its motion of dismissal so that the Plaintiff may file the attached draft amended complaint.

Dated: February 23, 2025                    y:          Respectfully submitted b

*Jonathan Affleck*

Jonathan Affleck
2991 Sacramento St. #296
Berkeley, CA 94703
Jonathan.Affleck@protonmail.com
(617) 276-5788

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1

I hereby certify that on August 7, 2024, Jonathan Affleck, Plaintiff *pro se*, conferred

with Alexandra Settelmayer, counsel for Defendant, but did not obtain assent to this

motion.

*Jonathan Affleck*

Dated: February 23, 2025                         Jonathan Affleck

## CERTIFICATE OF SERVICE

I hereby certify that the within document filed through the CM/ECF system will

11

be sent electronically to the registered participants as identified on the Notice of

Electronic Filing and paper copies will be sent to those indicated as non-registered

participants.

Dated: February 23, 2025

Jonathan Affleck